**Joanne KINOY and Arthur Kinoy,
Plaintiffs,**

v.

**John N. MITCHELL, Individually and as
former Attorney General of the United States, et al., Defendants.**

**No. 70 Civ. 5698.**

United States District Court,
S. D. New York.

June 3, 1975.

Rhonda Copelon, Center for Constitutional Rights, Michael D. Ratner, Jeremiah S. Gutman, William J. Bender, New York City, of counsel, for plaintiffs.

Paul J. Curran, U. S. Atty., S. D. N. Y., for defendants other than Mitchell; Mel P. Barkan, New York City, of counsel.

Edward S. Christenbury, Dept. of Justice, for John N. Mitchell in his official capacity.

Segal & Hundley, New York City, for John N. Mitchell individually; Marvin B. Segal, New York City, of counsel.

ROBERT J. WARD, District Judge.

Arthur Kinoy ("Kinoy"), an attorney, and his daughter and client, Joanne

Kinoy[1] brought this action in 1970,[2] seeking civil damages, injunctive and declaratory relief, and invoking this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(4), and 1346. In the single cause of action which now remains in their amended complaint,[3] they allege that over a substantial period of time defendants, individually and in their official capacities, authorized and conducted illegal and unconstitutional electronic surveillance of telephone conversations to which they were parties. They specifically allege violations of the Fourth, Fifth, Sixth and Ninth Amendments to the Constitution of the United States, 18 U.S.C. §§ 2510–2520,[4] 47 U.S.C. § 605,[5] and the attorney-client privilege.

After an initial flurry of activity, the case remained dormant until January, 1973, when this Court called it for a calendar conference.[6] At that conference the Government[7] agreed to disclose information concerning any electronic surveillance of plaintiffs. Plaintiffs served interrogatories upon John N. Mitchell ("Mitchell"), Whitney North Seymour, Jr. ("Seymour"), and John H. Doyle ("Doyle"), asking whether they had been the subjects of electronic surveillance recorded by anyone in the federal government, and seeking to ascertain the identity of those persons responsible for searching government files or for keeping and maintaining any records concerning the surveillance.

Doyle (whose role, as Assistant United States Attorney, was limited) responded to the interrogatories, while both Mitchell and Seymour responded in part and objected in part. Mitchell, however, stated that a search would be made of government files, and that the Court would be informed of both the nature and the results of that search. On May 30, 1973 John H. Davitt ("Davitt"), Chief of the Internal Security Section of the Criminal Division of the Department of Justice, filed an affidavit in which he stated that he had requested seven named agencies of the United

1. Joanne Kinoy asks that the Court permit her also to represent the class of Arthur Kinoy's clients whose conversations with him may have been monitored. The allegations of the amended complaint are framed as class allegations.

2. The controversy at that time arose from a subpoena directing Joanne Kinoy to testify before a grand jury. Although contesting alleged abuses of the subpoena power, she did testify; the questions addressed to her suggested that certain conversations had been electronically monitored. Incomplete and inconclusive Government responses during the early proceedings in this lawsuit reinforced this impression. The amended complaint incorporated allegations addressed to this suspected wiretapping which subsequent disclosures, discussed below, confirmed.

3. Judge Tenney of this Court denied defendants' motion to dismiss this cause of action, but granted the motion as to all other claims, in a memorandum decision and order filed July 13, 1971. On October 2, 1971, he declined to certify an appeal pursuant to 28 U.S.C. § 1292(b).

4. Title III of the Omnibus Crime Control and Safe Streets Act, enacted in 1968, which authorizes and regulates the use of electronic surveillance for certain classes of crimes.

5. § 605 of the Communications Act of 1934, which prohibits the unauthorized interception and publication or use of communications.

6. Because of the number and the complexity of the interrelated pending motions, the developments since that date will be set forth in some detail.

7. Although, since July 24, 1973 defendant Mitchell has been represented by private counsel, and not, as are the other defendants, by the United States Attorney for the Southern District of New York, he has substantially subscribed to the positions taken by the other defendants on the outstanding motions, and for convenience in this opinion, the defendants will be referred to collectively as "the Government," except where his position is different.

States Government [8] to determine whether they had conducted any electronic surveillance directed at either plaintiff, or if, in the course of other electronic surveillance, conversations of either plaintiff had been overheard. He then disclosed that there had been no electronic surveillance of Joanne Kinoy, and no direct electronic surveillance of Arthur Kinoy, but that the Federal Bureau of Investigation ("F.B.I.") files contained records of twenty-three instances in which conversations of Arthur Kinoy had been overheard incidental to national security intelligence investigations of other persons. Nine of these instances were in connection with what are described as "foreign intelligence" investigations; the remaining fourteen involved what is now known as "domestic security" investigations. According to Mr. Davitt, the latter overhearings took place between June 10, 1955 and November 4, 1970. Mr. Davitt further stated that conversations in which Kinoy did not fully identify himself, or which were monitored "with the consent of one of the parties," would not be reflected in the F.B.I. recordkeeping indices used to record such incidental overhearings.

Each of these electronic surveillances was authorized by the Attorney General at the time, not by a judicial warrant, pursuant to the procedure which the Supreme Court, in United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (hereinafter referred to as "*Keith*"), subsequently declared unconstitutional when followed in connection with domestic security intelligence investigations.

Plaintiffs then moved pursuant to Rule 37, Fed.R.Civ.P., to compel answers to those portions of their interrogatories to which Mitchell and Seymour had partly responded or had objected. They also noticed a deposition of Davitt and served him with a subpoena duces tecum, requesting that he produce all documents relating to the search of Government files and the F.B.I. records of the twenty-three disclosed "incidental overhears." The Government opposed plaintiffs' Rule 37 motion and moved to vacate the notice of deposition and quash the subpoena duces tecum served on Davitt. These procedural maneuvers occupied from June through August of 1973, and in September the Court heard oral argument on the motions. At that time the Government agreed to produce some of the items to which the subpoena duces tecum served on Davitt was addressed, specifically, his requests to various agencies to search their files for records of surveillance of plaintiffs, and those agencies' responses. The Government also agreed to produce the F.B.I.'s response for the Court's *in camera* inspection.

There remained for decision plaintiffs' Rule 37 motion, the Government's motion to vacate the notice of deposition of Davitt, and the remaining items of the subpoena addressed to him, requesting production of the actual records of the electronic surveillance which had been disclosed. The Court agreed to reserve decision to permit the Government both to lodge a formal claim of privilege concerning the materials which plaintiffs sought, and to move for summary judgment. In November the Government so moved, and filed two affidavits by Elliot L. Richardson ("Richardson"), then Attorney General, as a formal assertion that the authorizations and records of the foreign intelligence wiretaps and three of the fourteen domestic security wiretaps are privileged. The Government agreed to disclose to plaintiffs its records of the remaining eleven domestic security interceptions subject to a mutually acceptable protective order.

8. These included:
Federal Bureau of Investigation;
Bureau of Narcotics and Dangerous Drugs;
United States Secret Service;
Internal Revenue Service;
Bureau of Customs;
Bureau of Alcohol, Tobacco and Firearms;
United States Postal Service.

**6**

On January 15, as it had promised in oral argument and in Richardson's affidavit, the Government submitted to the Court under seal, for its *in camera* inspection and ruling, the authorizations and records of those wiretaps which it claimed were privileged. For the reasons discussed below, to date the Court has not examined these sealed documents.

In late May plaintiffs moved to strike the Richardson affidavits as inadequate to properly assert claims of executive privilege, and formally renewed their motion pursuant to Rule 37, to compel all the discovery which they had hitherto unsuccessfully sought.

For a variety of reasons unrelated to this action, despite the already prolonged delays, the parties agreed to postpone argument and decisions on these motions until January, 1975.[9] Since that time the Court has given the matter its most careful consideration.

It seems almost superfluous in the context of recent events to comment that this is an area of the law of great complexity, in which persons in all branches of government must carefully balance and accommodate competing fundamental values. Both Congress and the Supreme Court have spoken clearly in favor of safeguarding individual privacy and freedom of expression, and

have emphasized that the discretion of the Executive branch is not absolute.[10] Yet equally clearly the Executive must be afforded the discretion, even secrecy, necessary to exercise its proper function,[11] which certainly includes preserving the nation's security from both foreign and domestic attack.[12]

At times, as in the present case, these values come in conflict. Such conflicts can only be resolved, in this Court's judgment, by a most deliberate adherence to the principles and the procedures which the law has already prescribed. Accordingly, the Court has closely examined the cases articulating these principles and procedures, and decides the motions as follows:

### I. The Discovery Motions

**A.** *The Motion to Strike the Richardson Affidavits as a Claim of Privilege*

Rule 26, Fed.R.Civ.P., which applies to the Federal Government just as to any other civil litigant,[13] permits discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action." Privilege, as used in Rule 26, means privilege as determined by the rules of evidence.[14] Unless the material which the Government seeks to withhold falls within the governmental privileges recognized by

---

9. In February, 1975, after the oral argument, the parties finally settled the protective orders concerning the eleven domestic security interceptions, and used that opportunity to further argue their respective positions to the Court.

10. *See, e. g.*, 18 U.S.C. §§ 2510–2520; United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (*"Keith"*); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also*, United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

11. *See, esp.*, discussion in *Keith, supra*, and United States v. Nixon, *supra*. *See also*, Levi, Address to Association of the Bar of the City of New York, April 28, 1975, N.Y. Law Journal, April 30, 1975 at 1, col. 3; May 1, 1975 at 1, col. 1.

12. *Id.*

13. United States v. Procter & Gamble Co., 356 U.S. 677, 681, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Sperandeo v. Milk Drivers and Dairy Employees Local U. No. 537, 334 F.2d 381, 384 (10th Cir. 1964).

14. United States v. Reynolds, 345 U.S. 1, 6, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (*"Reynolds"*).

the common law of evidence,[15] it must be disclosed. The Court, not the executive officer claiming privilege, makes the judgment whether to uphold or overrule the claim.[16]

Richardson, as Attorney General, filed an affidavit claiming that the records pertaining to nine of the interceptions were privileged because the surveillances were conducted to "protect the Nation against actual or potential attack or other hostile acts of foreign powers, to obtain foreign intelligence information deemed essential to the security of the United States and/or to protect national security information against foreign intelligence activities."[17] The records pertaining to three of the interceptions were privileged, he claimed, because the surveillances were conducted "to protect the United States against the overthrow of the Government by force

15. The Federal Rules of Evidence, enacted January 2, 1975, and effective July 1, 1975 deal with the rules of privilege only briefly. Rule 501 states "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Thus, even were the Court deciding these motions after the effective date of the Rules, it would turn to the existing common law of privilege.

16. *Reynolds, supra*, at 8 and at note 21, 73 S.Ct. 528; United States v. Nixon, *supra*, 418 U.S. at 705, 94 S.Ct. 3090.

17. Because of its importance, this affidavit is set forth in its entirety:

ELLIOT L. RICHARDSON, being duly sworn, deposes and says:

1. I am the Attorney General of the United States of America.

2. I submit this affidavit on behalf of the United States of America in conjunction with the accompanying motion for summary judgment and in opposition to the disclosure to the plaintiffs by the Federal defendants herein of information concerning the incidental overhearings on nine occasions of plaintiff Arthur Kinoy which occurred during the course of national security electronic surveillance of others and are referred to in paragraph 5.e.(1) of the affidavit of John H. Davitt, dated May 25, 1973, on file in this action. In addition to other pertinent information, a sealed exhibit (Exhibit A), submitted herewith for *in camera* inspection, contains records of the intercepted conversations and the identity and location of the premises which were the subjects of the surveillance.

3. The electronic surveillances contained in Exhibit A were authorized and approved by the then Attorneys General of the United States, in the exercise of the President's authority relating to the Nation's foreign affairs, as described in 18 U.S.C. § 2511(3), and were deemed necessary to protect the Nation against actual or potential attack or other hostile acts of foreign powers, to obtain foreign intelligence information deemed essential to the security of the United States and/or to protect national security information against foreign intelligence activities. The decisions to authorize surveillance were based upon the information contained in the requests of the Director of the Federal Bureau of Investigation, which were considered in conjunction with the entire range of intelligence information available to the President of the United States.

4. I certify that it would be a practical impossibility to submit to the Court all of the facts, circumstances and other considerations upon which each authorization was based. I further certify that it would prejudice the national interest to disclose the particular facts contained in the attached sealed exhibit concerning these surveillances other than to the Court, *in camera*.

5. I respectfully request that the Court treat the contents of the attached sealed exhibit for security purposes as it was treated in submission to the Court and to return that exhibit to the Department of Justice at the conclusion of any hearing on this matter. The Department of Justice will retain that exhibit under the Court's seal subject to any Orders of this Court or other court of competent jurisdiction.

s/ Elliot L. Richarson
ELLIOT L. RICHARDSON
Attorney General of the United States

or other unlawful means," and although "all national security electronic surveillance conducted for domestic intelligence gathering purposes was discontinued following [the '*Keith*' decision]," disclosure of the material other than to the Court *in camera* might "jeopardize the effectiveness of a current and continuing FBI intelligence investigation of the subject of that surveillance." These three interceptions allegedly occurred in early 1964.[18]

1. *Privilege for military and state secrets*

The first of the Richardson affidavits is clearly an attempt to assert the well-established governmental privilege which protects absolutely secrets of state and military secrets, because disclosure would jeopardize the national security. United States v. Reynolds, 345 U.S. 1, 10–11, 73 S.Ct. 528, 97 L.Ed. 727 (1953). As Wright describes this privilege, it is "a privilege for state secrets that protects information not officially disclosed to the public concerning the national defense or the international relations of the United States." Wright & Miller, Federal Practice and Procedure: Civil § 2019, p. 158 (1970).

Assertion of this privilege, which is not to be lightly invoked,[19] must be made by the head of the department or agency responsible for the records, after personal consideration of the material sought.[20] That person must set forth, with enough particularity to enable the Court to make an informed decision, the nature of the material withheld and of the threat to the national security should it be revealed.[21]

In deciding whether to uphold or overrule the claim of privilege, in the case of military or state secrets, the question for the Court is simply whether the Government has made a sufficient showing that the material is within the privileged category.[22] The Court must decide this question without forcing disclosure of material validly protected; how far the Court will probe depends upon the showing of need for the mate-

---

18. This claim was contained in a second affidavit, which differed from the first in paragraphs 3 and 4 as follows:

3. The electronic surveillances contained in Exhibit B were authorized and approved by the then Attorneys General of the United States, acting for the President, to obtain information deemed necessary to protect the United States against the overthrow of the Government by force or other unlawful means; such overhearings occurring on the following dates: June 10, 1955, November 16, 1961, January 8, 1964, February 6, 1964, March 2, 1964, May 29, 1969, June 23, 1969, June 27, 1970, July 6, 1970, July 14, 1970, July 22, 1970, July 27, 1970, August 13, 1970 and November 4, 1970. The decisions to authorize surveillance were based upon the information contained in the requests of the Director of the Federal Bureau of Investigation, which were considered in conjunction with the entire range of intelligence information available to the President of the United States.

4. Though all national security electronic surveillance conducted for domestic intelligence gathering purposes was discontinued following the June 19, 1972 decision of the United States Supreme Court, in United States v. United States District Court, I certify that it would prejudice the public interest to disclose other than to the Court *in camera* the particular facts with respect to the overhearings occurring on January 8, 1964, February 6, 1964 and March 2, 1964 in that such disclosures may jeopardize the effectiveness of a current and continuing FBI intelligence investigation of the subject of that surveillance. Moreover, in addition to the foregoing, to disclose the particular facts with respect to all overhearings identified by date in paragraph 3 above, other than under a Protective Order, would adversely affect the rights of other persons to said conversations not parties to this civil action.

19. *Reynolds, supra,* at 7, 73 S.Ct. 528.

20. *Id.,* at 8, 73 S.Ct. 528.

21. International Paper Company v. Fibreboard Corporation, 63 F.R.D. 88, 94 (D.Del. 1974).

22. *Reynolds, supra,* 345 U.S. at 8, 73 S.Ct. 528.

rial made by the party seeking disclosure.[23] *Reynolds, supra,* affords the Court a range of options, from accepting simply the formal claim where the showing of need is minimal, to *in camera* inspection of the documents, as a last resort, where the litigant's need is great and the Government's claim otherwise unsubstantiated.[24] However, once the Court is satisfied that the material is a secret of state or a military secret, whose disclosure would threaten the national security, the material is absolutely privileged from discovery.[25] In fact, Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875), cited in *Reynolds,*[26] supports dismissal of an action where simply to maintain the suit requires disclosure of military or state secrets. At this time, it would appear that the documents authorizing and recording the incidental surveillance of Kinoy are of the essence of his case, and that, should they be protected from disclosure by the governmental privilege asserted, *Totten* will require that this part of the action be dismissed.[27]

■ These serious consequences for the plaintiffs' case in this Court's view mandate most careful consideration of the claim of privilege. It is of the utmost importance, first, that the Government comply with the formal requisites for assertion of the claim. It does not appear, from the Richardson affidavits, that the Attorney General personally considered the material as to which he lodged this claim of privilege and decided that it was a military or state secret. *Reynolds* quoted from an English case:

"The essential matter is that the decision to object should be taken by the minister who is the political head of the department and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced. . . . " Duncan v. Cammell, Laird & Co., [1942] A.C. 624, 638. *Reynolds, supra,* at n. 20.

■ This is not, in the Court's view, a mere technical requirement. Because the Court must rely so heavily upon the judgment of the responsible executive officer in a case such as this, it must be clear that the judgment was properly exercised. At a minimum there must be an explicit representation to this effect.

Moreover, without yet considering the *in camera* submissions, the Court also finds the affidavit concerning privilege insufficiently specific to be of any assistance in the Court's proper function of deciding whether the documents in question do fall within the privileged

23. *Id.,* at 8, 11, 73 S.Ct. 528.

24. *Id.,* at 9–10, 73 S.Ct. 528.

25. *Id.,* at 11, 73 S.Ct. 528.

26. *Id.,* 345 U.S. pp. 7, 11, at notes 11, 26, 73 S.Ct. 528.

27. Of course, this would leave undetermined significant questions. This Court is of the view that the Fourth Amendment protects citizens against unreasonable electronic surveillance for foreign security purposes even though it may perhaps not require prior judicial authorization for such surveillance. And Bivens, *supra,* does create a civil remedy for infringement of Fourth Amendment rights. But the Supreme Court has not outlined the scope of the Fourth Amendment's requirements in this area, and Congress has established neither statutory requirements for such surveillance nor an express civil remedy for Federal officials' violations of citizens' Constitutional rights. Does the fact that the records of electronic surveillance for foreign security purposes, should they involve military or state secrets, are privileged, remove violations of citizens' Fourth Amendment rights in this respect from the reach of a Bivens remedy? Or does the Court's recognition of an asserted claim of privilege in such a case operate also as a decision that the Fourth Amendment's requirements of reasonableness were satisfied? Even though these questions remain, this Court is inclined, in the present state of the law, to adhere to the rule of Totten and dismiss the "foreign security surveillance" branch of this civil damage action in the event that it upholds the claim of privilege based upon military and state secrets.

category. While the Court is competent and indeed required to make a judgment whether the material is a military or state secret whose disclosure would jeopardize the national security, it must necessarily also rely to a great extent upon the judgment of the executive officer more directly responsible for decisions in this area. The documents may be fully self-explanatory, and the Attorney General is, of course, entitled to decide, as he or his subordinates did here, that the appropriate method to present the Court with his reasons for invoking the privilege is to submit simply the underlying documents for *in camera* inspection. And, of course, *Reynolds* does not require the Court, in this case, to rely solely on the affidavit of the Attorney General. But upon preliminary consideration the Court finds the affidavit inadequate.

■ Accordingly, the Court declines to recognize the Government's claim that the documents contained in *in camera* Exhibit A are privileged military or state secrets until assertion of that claim is made by the Attorney General upon personal consideration. The Court also requests that the Government insure that the Court possesses the requisite supporting material to enable it to make an informed judgment upon the merits of the claim of privilege.

2. *Privilege for material connected to ongoing domestic intelligence investigations*

■ The second Richardson affidavit claims that the records of three interceptions which occurred in 1964 are privileged because the surveillances were authorized "to obtain information deemed necessary to protect the United States against the overthrow of the Government by force or other unlawful

means" and the subjects of the surveillances are under continuing investigation which would be jeopardized by disclosure except to the Court *in camera*. This affidavit is similarly defective as a formal claim of privilege because it contains no indication that the Attorney General personally considered the material and decided that disclosure would seriously endanger national interests.[28] But before requiring the Attorney General to cure this defect the Court will consider whether, even were the claim formally correct, the ground asserted constitutes a cognizable basis for governmental privilege.

Precisely stated, the Government claims privilege to withhold discovery of material connected with "domestic security" investigations which are active and not closed at the time the claim is asserted. *Keith, supra,* discussed such investigations at length, acknowledging their necessity and importance, but ruling that electronic surveillances connected to such investigations must be authorized by judicial warrant, 407 U.S. 297, at 310 et seq., 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

This is not an assertion of the well established and absolute military or state secrets privilege discussed above. There is no claim that this material relates to the national defense or the international relations of the United States. To be cognizable, the claim must fall within one of the other recognized common law categories of governmental privilege, or the Court must, "in the light of reason and experience," [29] recognize a new basis for such privilege.

■ There are other well recognized grounds upon which the Government may claim privilege in civil litigation. Among the matters protected from disclosure are the deliberative and

---

28. 8 Wright & Miller, *supra,* § 2019, at pp. 170–171, Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, at note 33 (D. D.C.1966), aff'd, 128 U.S.App.D.C. 10, 384 F.2d 979 (1967), cert. den., 389 U.S. 952, 88

S.Ct. 334, 19 L.Ed.2d 361 (1967); Carter v. Carlson, 56 F.R.D. 9 (D.D.C.1972).

29. *See* note 15, *supra.*

decision-making processes of Government officials,[30] the identity of informers cooperating in law enforcement,[31] investigative reports of an administrative agency to the extent that they reflect advisory rather than factual material,[32] and police files compiled in connection with an ongoing criminal investigation.[33] This type of information is protected by a qualified, not an absolute privilege, so that the claim of privilege made by the Government may be overcome by a litigant's showing of need for the material great enough to outweigh the policies favoring nondisclosure.[34] Or the Court may reconcile the competing interests, after *in camera* inspection of the documents, by ordering partial disclosure, or disclosure subject to a protective order.[35]

■■■ Procedurally, such claims of privilege, like those based upon military and state secrets, must be lodged by the head of the agency concerned, after personal consideration of the material and evaluation of the risks of disclosure.[36] But the decision whether to uphold the claim rests always with the Court, after balancing all the various interests.[37] If the Court does not uphold the privilege, the Government, if it then resists discovery, may incur the range of sanctions provided by Rule 37.[38]

The factors which the Court considers are many and complex. The deliberative and decision-making processes of Government officials are held confidential to preserve the free expression, integrity and independence of those responsible for making the determinations that enable government to operate.[39] The identity of informers is kept secret to encourage cooperation with law enforcement agents in part by protecting informers from reprisals, and to preserve their effectiveness.[40]

---

30. Carl Zeiss Stiftung, *supra*, at 324, 326; United States v. Nixon, 418 U.S. 683, 94 S. Ct. 3090, 41 L.Ed.2d 1039 (1974).

31. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Westinghouse Electric Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 351 F.2d 762 (1965); Black v. Sheraton Corp. of America, 47 F. R.D. 263 (D.D.C.1969).

32. J. H. Rutter Rex Manufacturing Co., Inc. v. N.L.R.B., 473 F.2d 223, 232 (5th Cir. 1973), cert. denied, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973); Carl Zeiss Stiftung, *supra*.

33. Timken Roller Bearing Co. v. United States, 38 F.R.D. 57 (N.D.Ohio 1964); Brown v. Thompson, 430 F.2d 1214 (5th Cir. 1970); Boyd v. Gullett, 64 F.R.D. 169 (D.Md.1974); Wood v. Breier, 54 F.R.D. 7 (E.D.Wis.1972).

34. Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958); Timken Roller Bearing Co. v. United States, *supra*, at 64; Carl Zeiss Stiftung, *supra*, at 327; United States v. Nixon, *supra*, 418 U.S. at 706–707, 94 S. Ct. 3090; Mitchell v. Roma, 265 F.2d 633, 635–36 (3d Cir. 1959).

35. United States v. Nixon, *supra;* Boyd v. Gullett, *supra;* Wood v. Breier, *supra;* Swanner v. United States, 406 F.2d 716 (5th Cir. 1969); Boeing Airplane Company v. Coggeshall, 108 U.S.App.D.C. 106, 280 F.2d 654 (1960).

36. See cases cited in note 28, *supra*. The only exception is a claim asserted solely to protect the identity of informers, which may be lodged by any representative of the Government.

37. United States v. Nixon, *supra;* N.L.R.B. v. Capitol Fish Co., 294 F.2d 868, 875 (5th Cir. 1965); Mitchell v. Bass, 252 F.2d 513 (8th Cir. 1958); Olsen v. Camp, 328 F. Supp. 728, 730 (E.D.Mich.1970); Wood v.

38. Wright & Miller, *supra*, § 2019, at 172–3; Mitchell v. Bass, *supra;* Sperandeo v. Milk Drivers and Dairy Employees, *supra;* Black v. Sheraton Corp. of America, 47 F.R.D. 263 (D.D.C.1969).

39. Carl Zeiss Stiftung, *supra*, at 325–6; United States v. Nixon, *supra*, 418 U.S. at 705–706, 94 S.Ct. 3090.

40. Robiaro, *supra;* Westinghouse Electric Corp. v. City of Burlington, *supra*, at 768; Black v. Sheraton Corp. of America, 47 F. R.D. 263 (D.D.C.1969); Mitchell v. Bass, *supra*, at 516.

Courts deciding whether material in investigative files is privileged [41] frequently consider whether disclosure of such files will reveal advisory or deliberative processes, or the identity of informers, and will order disclosure of the purely factual segments, and deletion of the informers' names.[42]

When the investigation is conducted with eventual criminal prosecution in mind, or where the files are sought in connection with civil litigation while a criminal prosecution arising from the same facts is pending, courts will not permit the defendant to circumvent the restrictions placed upon criminal discovery by attempting to compel disclosure in the civil case.[43] Such a privilege is not of unlimited duration, but ceases after a reasonable time.[44]

Against these considerations favoring nondisclosure, the courts weigh the needs of the litigant seeking disclosure, keeping in mind the philosophy of broad discovery which the Federal Rules of Civil Procedure embrace.[45] Discovery is most likely when the material is centrally important and the litigant has no other means of obtaining equivalent proof of his allegations or defenses.[46] The Congressional policy in favor of broad enforcement of the civil rights laws supports complete discovery when their violation is alleged.[47] Similarly, when the case involves colorable claims of official misconduct the Courts are reluctant to permit officials to withhold relevant material by claiming privilege.[48]

In this case plaintiffs have made the strongest possible showing of need for the documents requested. They are the key records of wiretapping which plaintiffs allege was unconstitutional, and there is no other available but less sensitive source of the information contained therein, or of equivalent proof of the allegations of the amended complaint. Even were the Court to hold *Keith's* warrant requirement not retroactive, the question of the reasonableness of these surveillances would survive. The Supreme Court has spoken in strong support of individual conversational privacy and freedom of speech, and freedom from unreasonable search, even in matters involving domestic security. Plaintiffs have alleged violations of their Fourth Amendment rights by Government officials.

The Government has as yet made no claim that this material consists of confidential deliberations or informers' identities. After at least ten years of

---

41. The parties have referred the Court, by way of analogy, to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7), which completely exempts from disclosure to any private citizen requesting information, material contained in "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency." That Act, designed to make public a wide range of information in the possession of the Government, cannot be read to limit the discovery available to parties in civil litigation. Since, as noted above, the discovery provisions of the Federal Rules of Civil Procedure give parties in civil litigation access to certain material contained in investigatory files, even files compiled for law enforcement purposes, further consideration of the FOIA, even by analogy, is superfluous.

42. Swanner v. United States, *supra;* Boyd v. Gullett, *supra;* J. H. Rutter Rex Manufacturing Co., Inc. v. N.L.R.B., *supra.*

43. Alexander v. Rizzo, 50 F.R.D. 374 (E.D. Pa.1970).

44. Swanner v. United States, *supra;* Capitol Vending Co. v. Baker, 35 F.R.D. 510 (D.D. C.1964).

45. Timken Roller Bearing Co., *supra;* Wood v. Breier, *supra.*

46. Carl Zeiss Stiftung, *supra.*

47. Wood v. Breier, *supra;* Boyd v. Gullett, *supra;* Black v. Sheraton Corp. of America, 47 F.R.D. 263, 267 (D.D.C.1969).

48. Wood v. Breier, *supra;* Rosee v. Board of Trade of City of Chicago, 36 F.R.D. 684, 690 (N.D.Ill.1965); Carl Zeiss Stiftung, *supra;* Olsen v. Camp, *supra,* at 731.

investigation of persons considered dangerous to the national security, it does not claim that it intends to use this material in any criminal prosecution. It simply states in a conclusory fashion that to reveal it other than to the Court *in camera* would undermine a continuing intelligence investigation to such an extent that it would seriously jeopardize the "national security," and submits the records themselves to allow the Court to make its own determination that this material is connected to an ongoing domestic intelligence investigation. It argues that a privilege to withhold such material should be recognized from its conceded authority to conduct national security investigations, because secrecy is essential to the effectiveness of such investigations.

In essence, this is a request for recognition of a privilege analogous to that for military and state secrets, in the sense that the mere existence of an ongoing domestic intelligence investigation would justify complete nondisclosure of any related material in the context of civil litigation. The Government made a similar argument in *Keith*, strenuously claiming that the effectiveness of this type of investigation would be seriously impaired by a requirement that all electronic surveillance be authorized by a warrant. This case raises issues of Fourth Amendment rights similar to those raised in *Keith*, in the context now of claimed common law or statutory remedies for alleged injuries rather than the before-the-fact safeguard which the warrant requirement represents.

The Court in *Keith, supra*, recognized the duty and the power of the President "to protect our Government against those who would subvert or overthrow it by unlawful means," 407 U.S. 297, at 310, 92 S.Ct. 2125, at 2133, 32 L.Ed.2d 752 and the necessity of "the prudent and lawful employment of those very techniques which are employed against the Government and its law-abiding citizens." *Id.*, at 312, 92 S.Ct. at 2134. It

emphasized that "unless Government safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered." *Id.*, at 312, 92 S.Ct. at 2134. But it also stressed the importance of the "cherished privacy of law-abiding citizens" *id.*, at 312, 92 S.Ct. at 2134, and the "convergence of First and Fourth Amendment values not present in cases of ordinary crime." *Id.*, at 313, 92 S.Ct. at 2135.

> History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies. Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect "domestic security." Given the difficulty of defining the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent. . . . The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power. Nor must the fear of unauthorized official eavesdropping deter vigorous citizen dissent and discussion of Government action in private conversation. For private dissent, no less than open public discourse, is essential to our free society. *Id.*, at 314, 92 S. Ct. at 2135.

Because the Fourth Amendment is not absolute in its terms, the Court analyzed the problem presented to it by balancing the basic values at stake. It determined that the balance lay in favor of a warrant requirement, rather than an executive officer's determination of "reasonableness," for electronic surveillance in connection with domestic security intelligence investigations. In so doing it re-

**14**

jected the Government's arguments that the special circumstances, including that these surveillances are not attempts to gather evidence for specific criminal prosecutions, applicable to domestic security surveillances necessitated a further exception to the warrant requirement; that the Courts are not equipped to determine the reasonableness of such surveillances; and that to involve the Courts in such determinations would create a most serious risk of disclosure which would threaten not only the effectiveness of the intelligence mission but also the lives and safety of agents and informers. *Id.,* at 321, 92 S.Ct. 2125.

 Evidentiary privileges are to be construed narrowly, to permit the broadest possible discovery consistent with the purposes of the privilege. United States v. Nixon, 418 U.S. 683, 709–710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). As the Court in *Keith* noted, and as recent events have so clearly demonstrated, domestic security is an elusive concept, susceptible of many subjective interpretations and possible abuse. *Keith,* supra, 407 U.S. at 320, 92 S.Ct. 2125. Just as a warrant is appropriate and indeed Constitutionally required before electronic surveillance is undertaken in the name of the "domestic security," so should the established rules of evidence, which permit case by case evaluations, apply when the Government claims privilege with respect to such surveillance in civil litigation, especially litigation such as this alleging violations of Fourth Amendment rights.

 This Court is of the view that the existence of an ongoing domestic security investigation should support a qualified privilege, which would permit the Court to balance the litigant's need for the material considering the nature of the case as well as the principles in favor of broad discovery, against the Government's particular showing of need for secrecy.

The Courts in recent cases considering similar issues have applied such a balancing analysis, considering all of the factors discussed above, to determine whether in any particular case material should be disclosed or withheld. The mere fact that the materials in question were F.B.I. intelligence records has not served to remove them from the scope of this process.[49] The Richardson affidavit which refers to *in camera* Exhibit B, standing alone, does not demonstrate with the required specificity why an appropriate protective order cannot accommodate the Government's need to safeguard an intelligence investigation while at the same time permitting plaintiffs access to the records of interceptions which occurred in 1964. (Again, of course, as in the case of the foreign intelligence materials, the documents submitted *in camera* may perhaps themselves suffice to demonstrate the claimed threat to the national interests, although the Court could certainly benefit from the reasoned opinion of the responsible executive officer.) *See* Black v. Sheraton Corp. of America, 371 F.Supp. 97, 101 (D.D.C.1974).

Accordingly, the Court will require the Attorney General to lodge a formally sufficient claim of privilege, including particular reasons that a protective order will not satisfy the need for secrecy, based upon his personal examination of the documents in question. Thereafter, the Court will weigh that claim against the plaintiffs' thus far persuasive showing of need for the documents, in accordance with the standards discussed herein. The Court will then, of course, have the benefit of a current evaluation, by the head of the agency responsible, of the asserted importance of maintaining absolute secrecy of this limited material connected to a still ongoing investiga-

---

49. Jabara v. Kelly, 62 F.R.D. 424 (E.D. Mich.1974) ; United States v. Ahmad, 499 F.2d 851 (3d Cir. 1974) ; Black v. Sheraton Corp. of America, 371 F.Supp. 97 (D.D.C. 1974).

tion, and will be able to make its own decision in an appropriately informed manner.

## B. *The Remaining Discovery Motions*

The Government, by motion, seeks to vacate the notice of deposition and quash the subpoena duces tecum served on Davitt, thereby blocking plaintiffs' efforts to compel discovery of material not contained in the *in camera* exhibits, and not yet furnished to them by agreement. The parties, at the oral argument in January, 1975, addressed themselves almost exclusively to the motion to strike the Richardson affidavits as a claim of privilege and to the summary judgment motion. In this Court's view, the remaining discovery motions are not ripe for decision at this time. Despite the prolonged delay since they were first brought, a decision on the merits should be postponed until such time as those portions which remain relevant and contested can be more clearly presented. It may be that the Court's decision today, and its ultimate ruling on the question of privilege, as well as plaintiffs' consideration of the documents thus far conveyed to them, will materially affect the scope of either necessary or permissible discovery beyond the *in camera* exhibits.

Accordingly, in order to clarify the issues before the Court, and not as a decision on the merits, plaintiffs' outstanding motions to compel discovery will be denied, and the defendants' motions to vacate the notice of deposition and quash the subpoena duces tecum served on Davitt will be granted, without prejudice to plaintiffs' right to renew their efforts to obtain appropriate further discovery.

## II *The Summary Judgment Motion*

■ The *in camera* exhibits were submitted not only as a part of a formal assertion of governmental or executive privilege, but also "in connection with the accompanying motion for summary judgment." In that omnibus motion the Government requests the Court to determine, *inter alia,* whether certain electronic surveillance concerned foreign rather than domestic security, the constitutionality of this warrantless foreign security wiretapping, the retroactive applicability of the *Keith* decision, and the nonexistence of any communication of the contents of the interceptions which would constitute a violation of 47 U.S.C. § 605. Simultaneously, therefore, the Government presents the Court, *in camera,* with material which it asserts must be withheld from plaintiffs as privileged, yet which it requests the Court to consider in ascertaining material facts and drawing legal conclusions concerning dispositive issues in the case. In this Court's view such a course is wholly unacceptable. Our system of justice does not encompass *ex parte* determinations on the merits of cases in civil litigation. Either the documents are privileged, and the litigation must continue as best it can without them,[50] or they should be disclosed at least to the parties, in which case the Court will rule after full argument on the merits.

The Government argues that Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969) supports its

---

50. The Court recognizes that these documents, or the information contained in them, are of central importance to the plaintiffs' case. This is a factor which the Court considers in ruling on the claim of privilege. It may be that portions of the case cannot continue if the privilege claimed is upheld. The Proposed Federal Rules of Evidence provided Courts with a range of choices, "in the interests of justice," should they uphold a claim of privilege. Proposed Rule 509(e), approved by the Supreme Court November 20, 1972. Those rules were not adopted by Congress, and the common law presently limits the Court's possibilities in a civil action against Government officials or the United States. Sanctions are only available where the privilege is overruled but the documents still withheld.

request for *ex parte, in camera,* proceedings to determine the legality of these electronic surveillances. The Court notes that the statements in that case were made in the context of a criminal proceeding, where the issue of suppression of evidence illegally obtained or the fruit of illegal surveillance was paramount. The Supreme Court had ruled that, on a suppression motion in a *criminal* case, the defendant, not otherwise entitled to discover such Government records, was entitled to production of the records of illegal surveillance, because he alone could determine what might be a fruit of that surveillance. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). In civil litigation a party is entitled to significantly broader discovery, and this Court is reluctant at this time to accept the sweeping proposition that all determinations of the legality of electronic surveillance may be made *ex parte.* Rather, the competing interests should be balanced in accordance with the usual principles governing civil discovery, discussed more fully above.

Therefore, the portion of the Government's motion requesting the Court to determine these issues is denied.

The Government also relies upon the representation contained in the Richardson affidavit, that all domestic security electronic surveillance has been discontinued since the *Keith* decision, to support that part of its summary judgment motion which asks the Court to dismiss as moot plaintiffs' request for an injunction against continuing illegal or unconstitutional electroinc surveillance. This is a disputed factual question which is of the essence of plaintiffs' case, and which the Court is unwilling to determine upon papers at this time, despite the great weight which it gives the Attorney General's sworn representation. The Court has not yet examined the merits of the Government's claim of privilege based upon military and state

secrets, and has therefore similarly not yet determined to its own satisfaction within such guidelines as presently exist that the surveillance in these instances was foreign intelligence surveillance. The Government has, of course, made no representation that what it terms foreign intelligence electronic surveillance does not continue to the present. Furthermore, the Davitt affidavit, as plaintiffs point out, itself described certain limitations in the F.B.I. recordkeeping and retrieval system for its electronic surveillance. These are serious questions, and in this Court's judgment, prudence requires that the plea for injunctive relief remain a part of this case at this time.

Although the Court agrees with the Government that the United States has not consented to be sued for damages on any of the grounds alleged in the complaint, because the injunctive portion of the complaint remains in the case for the present, the Court also declines to dismiss the complaint as against the United States.

The Government has requested that the damage claims against the former United States Attorney Seymour and former Assistant United States Attorney Doyle be dismissed. Defendant Doyle answered plaintiffs' interrogatories fully, in April of 1973, indicating no participation in any electronic surveillance of the Kinoys. Plaintiffs have made no attempt to dispute these answers, or to obtain supplementary responses. Accordingly, the claim against him will be dismissed. Defendant Seymour, however, returned only partial answers to plaintiffs' interrogatories, objecting to certain questions. Plaintiffs then moved to compel discovery, but have since apparently switched the focus of their inquiry to further exploration of the revelations contained in the Davitt affidavit, which contain no reference to Mr. Seymour. But until such time as it is more conclusively shown that he was not involved in electronic surveil-

lance of the Kinoys, the Court declines to dismiss the claim against him.

On the strength of Mr. Davitt's assertion that there were no recorded interceptions of Joanne Kinoy, the Government also asks that she be dismissed as a plaintiff, and as the representative of the "purported class" of Kinoy's clients. The Court considers dismissal of Joanne Kinoy premature until discovery is further advanced, or until the remaining discovery questions are determined on the merits.

Similarly, since the alleged violations of the privacy of consultations between Kinoy and his clients are framed as class allegations, the Government has moved that this aspect of the amended complaint be stricken. Although the case has been pending for several years, discovery is in fact at a relatively early stage. At the present time it is unknown whether or how many of Kinoy's clients may have been overheard in consultation with him, and what the nature of those conversations may have been. If none are discovered the question will be moot. If any such conversations were overheard, the Court cannot yet determine who are the members of the class or whether common questions of law and fact predominate over individual questions. The Court is also unable to determine at this time whether the sensitive nature of the evidence would make determination of these issues more manageable in a class action after the members of the class are known than in a series of individual actions. To rule on the question of whether this aspect of the case should proceed as a class action is premature, and accordingly, the Government's motion to strike the class allegations is denied.

Plaintiffs filed a jury demand on June 8, 1973, a week after the Davitt affidavit was filed but a year and a half after the Government's answer was filed. They argue that the new information contained in the affidavit entitled them to a jury despite the fact that according to Rule 38(b) and (d), Fed.R. Civ.P., such a demand was untimely. They alternatively ask the Court to exercise its discretion pursuant to Rule 39(b), Fed.R.Civ.P., to permit the case to be tried to a jury. The Government has moved to strike the jury demand.

In the answer filed on November 8, 1971, the Government declined to answer certain allegations in the complaint, because to do so would reveal privileged information, and generally denied that there had been any "illegal or unconstitutional electronic surveillance" of plaintiffs. The Court considers issue to have been joined at that time, and does not consider the material in the Davitt affidavits to have materially changed those issues. Under the circumstances, the Court exercised its discretion to strike assert a claim of privilege is granted. the jury demand.

Accordingly, the pending motions are disposed of as follows:

1. Plaintiffs' motion to strike the Richardson affidavits as insufficient to assert a claim of privilege is granted. The Court will permit the Government 45 days from the date of the filing of the order determining these motions to renew its claim of privilege upon an affidavit from the present Attorney General after his personal evaluation of the material and determination that disclosure would jeopardize the national security. Should the Government not choose to renew its claim, the Court will order the documents produced subject to an appropriate protective order. Should the Government renew its claim, the Court will rule promptly in accordance with the principles discussed herein. The sealed documents remain in the custody of the Court.

2. The Government's motion for summary judgment is denied, except that its requests that the damage claim against Doyle be dismissed, and that the jury demand be stricken, are granted.

3. Plaintiffs' motions to compel discovery are denied without prejudice to

their renewal at a later date, should that be necessary.

4. The Government's motion to vacate the notice of deposition and to quash the subpoena duces tecum addressed to Davitt is granted, without prejudice to plaintiffs' right to renew their requests, if necessary, at a later date.

Settle order on notice.